UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| MIGUEL ONETO, AS TRUSTEE OF THE MIGUEL ONETO TRUST,<br>      Plaintiff,<br><br>v.<br><br>LATINOAMERICANA DE ENERGÍA S.A., and HECTOR MARCELO RODRIGUEZ,<br>      Defendants. | Civil Action No. |

## COMPLAINT

Plaintiff Miguel Oneto, as Trustee of the Miguel Oneto Trust, a trust formed under the laws of the State of Texas ("Oneto" or "Plaintiff") file this complaint asserting claims for breach of contract and declaratory judgment against Latinoamericana de Energía S.A., ("LAE") and Hector Marcelo Rodriguez ("Rodriguez" and, together with LAE, "Defendants"), and alleges as follows:

### I.   THE PARTIES

1. Plaintiff Miguel Oneto, as Trustee of the Miguel Oneto Trust, a trust formed under the laws of the State of Texas has a principal place of business located at 28430 Valencia Circle W, Harlingen, TX 78552.  Plaintiff is a renewable energy project developer and a successful practicing physician radiologist from the Rio Grande Valley.

2. LAE is a corporation formed under the laws of the Republic of Argentina with its principal place of business at Gallo 1140, Piso 3, Depto. B, CABA, Argentina.  This court has personal jurisdiction over LAE as it conducted business in the state of Texas and consented to jurisdiction by agreement.  Upon information and belief, LAE provides a broad range of services, with the main focus on hydrocarbon field and plant operation management, maintenance of

1

process-related above-ground facilities, maintenance of large hydrocarbon piping networks, construction of site/facilities and access roads, instrument solutions and different types of works.

3. Rodriguez is the President of LAE. Upon information and belief, he resides in Buenos Aires, Argentina. This Court has personal jurisdiction over Rodriguez as he conducted business in Texas.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(2) as there is complete diversity of citizenship and the amount in controversy exceeds the sum or value of $75,000.

5. Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3), because all or a substantial part of the events or omissions giving rise to the claims in this action occurred in this District and Defendants are subject to this Court's personal jurisdiction with respect to this action.

## III. FACTUAL ALLEGATIONS

6. Plaintiff sought to develop a 693.25 megawatt (direct current)/517.35 megawatt (alternating current) photovoltaic solar power generation facility in Childress County, Texas, (the "Project") through its Affiliate Excel Advantage Services, LLC, a Texas limited liability company doing business as "Misae Solar Park II" (the "Project Company").

7. To facilitate the development of the Project, Miguel Oneto (individually), LAE, through its President Rodriguez, entered into a "Memorandum of Understanding/NDA" dated September 1, 2018 (the "MOU"); the "Amendment to the Original Memorandum of Understanding/NDA" dated March 15, 2019 (the "First Amended MOU"); and the "2nd. Amendment to the Original Memorandum of Understanding" dated June 14, 2019 (the "Second

Amended MOU," and, collectively, the "Prior Agreements").  True and accurate copies of the Prior Agreements are attached hereto as Exhibits 1-3.

      8.      The MOU contained the following milestone deadlines:

- E.1.1.B. Develop a preliminary solar resource assessment. Deadline: Oct 20, 2018.
- E.1.1. C. Provide a preliminary design of the solar plant and its production during its useful life. Deadline: Nov 20, 2018.
- E.1.3 Obtain a Letter of Intent of Purchase of the project with a non-refundable Security Deposit and with acceptable terms for the Owner. Deadline: Feb 28, 2019.
- E.2.5. TERMINATION: "… failure to comply with the deadlines is a cause for termination of this MOU."

      9.      LAE and Rodriguez failed to meet each of these deadlines.

      10.      These failures to meet deadlines, significantly delayed the development of the Project and its potential sale. This included the need to: repeat multiple studies, including environmental studies; prepare addenda to tax abatement agreements and a new 313 Tax value limitation agreement; and incur additional development expenses, 100% of which were paid by Plaintiff. Moreover, the delay occasioned by Defendants' breaches increased Plaintiff's real estate carrying costs.  Similarly, the defaults caused by LAE and Rodriguez caused Plaintiff to have to lead the development of the Project, diverting his attention and time from his successful medical practice, and losing significant income therefrom.

      11.      Plaintiff and LAE, through its President Rodriguez, executed the First Amended MOU on March 15, 2019.  Pursuant to the terms of the First amended MOU, LAE and Rodriguez were to "Lead and coordinate the development of the project 'Misae Solar Park II, Texas' until it is sold."  First Amended MOU, Sec. E1.4.

      12.      In addition, the first Amened MOU provides, "It is expressly stated that if the costs for the project development are higher than the estimated by Owner, it is a cause for termination of this MOU."  First Amended MOU, Sec. F5.

Case 1:21-cv-00175   Document 1   Filed on 11/12/21 in TXSD   Page 4 of 11

13.     Despite these provisions, after December 2019, Rodriguez and LAE failed to perform the services required by the First Amended MOU during January and February 2020. In addition, the costs exceeded what was estimated by Plaintiff in violation of the First Amended MOU.

14.     In addition to the additional costs which were borne by Plaintiff, Plaintiff was damaged by the delays occasioned by Defendants' nonperformance, including but not limited to, additional significant expenses and carrying costs.

15.     Because LAE and Rodriguez promised to present a new excellent investor to the Plaintiff, Plaintiff agreed to enter into the Second Amended MOU which contained terms required by the potential investor. The Second Amended MOU requires that the MISAE Solar Park II is sold by November 30th, 2019." Second Amended MOU, Sec. C.

16.     The sale of the Project did not close before November 30, 2019, and, in fact, never closed.

17.     This failure to close by the date prescribed by the Second Amended MOU, has caused additional serious damages, including but not limited to additional expenses and carrying costs and loss of market opportunity time. As the investor presented by LAE, which was supposed to safe harbor the Investment Tax Credit (ITC) rate of 30% for Excel Advantage Services, LLC dba Misae Solar Park II by December 2019, defaulted in December 2019. Plaintiff lost the opportunity to secure the Investment Tax Credit (ITC) rate of 30%, loosing 4% of ITC, which represented a future loss of approximately $24,000,000, which translated to a significant lower value of Excel at the time of its sale.

18.     Despite the multiple defaults by LAE and Rodriguez of the Prior Agreements, Plaintiff decided to give LAE and Rodriguez one absolute last opportunity with respect to the Project. On November 26, 2020, Plaintiff and LAE, through its President Rodriguez, entered into

4

a Development Agreement (the "Development Agreement"). The Development Agreement amended and wholly replaced the terms of the Prior Agreements. A true and accurate copy of the operative Development Agreement is attached hereto as Exhibit 4.

19. Pursuant to the terms of the Development Agreement, LAE was to be compensated as follows:

> (A) In exchange for the Co-Developers' provision of the Services, the Developer covenants and agrees to pay to the Co-Developers on the terms and conditions set forth in this Section 2.5 a fee equal to twenty-two percent (22%) multiplied by the Net Purchase Price, which product (as minuend) is then reduced by the sum of (1) the aggregate amount of the Co-Developers Commissions and Co-Developers' costs and expenses previously paid or reimbursed by the Developer plus (2) the aggregate amount of the Unpaid Co-Developers Commissions (the sum of parts (1) and (2) being the subtrahend) (collectively, the "Compensation"). The Compensation may be expressed in the following manner:
>
> *Compensation = (22% x NPP) – (PPR + UCC)*
>
> WHERE
>
> NPP = Net Purchase Price
> PPR = total amount of Co-Developers Commissions and Co-Developers' costs and expenses previously paid / reimbursed by the Developer
> UCC = total amount of Unpaid Co-Developers Commissions

Development Agreement Section 2.5(A)

20. Before LAE would be entitled to any compensation pursuant to Section 2.5(A) of the Development Agreement, the following conditions precedent needed to be satisfied:

> Prior to the Co-Developers having any claim or right to any Compensation (including to any installment payment thereof), the Developer first (i) shall be entitled to and must actually be repaid the entire amount of its Project Development Expenses (regardless of when due) and (ii) also shall have received sufficient funds from the Net Purchase Price to pay or to cause to be paid all Developer Commissions (regardless of when due). In the event of any ambiguity, disagreement, controversy, or dispute with any Person concerning the right to or payment of any Commission (in whole or in part), the Developer (A) shall have the sole discretion and right to contest, defend, direct, litigate, negotiate, mediate, arbitrate, and settle (as applicable) the terms and amount of such Commission and (B) shall have the right to reserve and to maintain (out of money constituting

> Purchase Price proceeds paid by the Purchaser) in a separate bankaccount (or in an escrow account of the Developer's selection) the maximum contested amount of any such Commission until such dispute or claim with relation to that Commission is resolved by a final court order that is binding with regard to the Persons thereto.

Development Agreement Sec. 2.5(B).

21. The term of the Development Agreement was:

> from the Effective Date until the earlier to occur of (A) 6:00 p.m. (CST) on January 15, 2021, and (B) the Sale date. If the Developer has Started Commercial Negotiations with a Potential Purchaser and if those negotiations remain ongoing as of January 15, 2021, then the Term automatically will be extended until the earlier to occur of (Y) the termination of such commercial negotiations between said Potential Purchaser and the Developer and (Z) 6:00 p.m. (CDT) on March 15, 2021. This Agreement automatically will terminate at the conclusion of the Term (or, as applicable, the extended Term). This Agreement may not be extended or delayed in any way or for any reason beyond 6:00 p.m. (CDT) on March 15, 2021.

Development Agreement, Sec. 2.9.

22. No sale of the Project closed prior to March 15, 2021. Accordingly, the Development Agreement terminated on March 15, 2021.

23. Pursuant to the terms of the Development agreement, in the event of termination

> The Co-Developers recognize andagree that time is of the essence. In the event that this Agreement terminatespursuant to Section 2.9 prior to a Sale, then the Co-Developers will have no claim or right to—and the Developer will have no obligation to pay to the Co- Developers—any Compensation (or any other amount) whatsoever, whether under this Agreement or under any other legal theory or claim of right (including, but not limited to, quantum meruit), except as described in theimmediately following sentence. The Co-Developers only will be entitled toCompensation if a Sale closes any time from January 16, 2021, until 6:00 p.m.(CDT) on March 15, 2021, and only so long as: (1) the Developer had StartedCommercial Negotiations with the actual Purchaser before January 15, 2021;(2) those commercial negotiations remained active and ongoing (as mutually agreed by the Purchaser and the Developer) as of 9:00 a.m. (CDT) on January15, 2021; (3) immediately prior to the closing of the Sale, the Purchaser qualified as a Potential Purchaser; (4) the Project at the time of Sale is the same As Presently Contemplated; and (5) at the time of the Sale, the RubiconAgreement remains in effect and has not terminated (for any or for no reason).

Development Agreement Sec. 2.5(D).

24. Defendants were aware the Development Agreement terminated on March 15, 2021 and were reminded of the termination on at least April 15, 2021. Moreover, Defendants have acknowledged that the Development Agreement terminated on March 15, 2021. The Development Agreement was never amended to extend its term beyond March 15, 2021.

25. In April 2021, after the Development Agreement terminated, Greenalia, a Spanish company, began discussions with Plaintiff to obtain information and analyze the Project. In late May 2019, Greenalia started due diligence with an exclusivity right. Finally, the deal closed on July 21, 2021. As the closing occurred after the termination of the Development Agreement, LAE was not entitled to any compensation thereunder. Development Agreement Sec. 2.5(D).

26. On October 29, 2021, counsel for LAE sent a demand letter to Oneto, a true and accurate copy of which is attached hereto as Exhibit 5. The Demand Letter acknowledges the termination of the Development Agreement prior to the closing of the Greenalia sale. Exhibit 5, at p. 2. Yet despite the Development Agreement's clear language that states,

> In the event that this Agreement terminates pursuant to Section 2.9 prior to a Sale, then the Co-Developers will have no claim or right to — and the Developer will have no obligation to pay to the Co- Developers — any Compensation (or any other amount) whatsoever, whether under this Agreement or under any other legal theory or claim of right (including, but not limited to, quantum meruit) . . . .

Development Agreement, Sec.2.5(D), the Demand Letter asserts claims under legal theories including, quasi contract and fraudulent inducement. Exhibit 5, pp. 2-3.

27. Plaintiff has also come to learn of LAE's and Rodriguez's fraudulent behavior and actions. These include:

- In September 2020, Carlos Merino, an employee of AVATAI which is a finder of LAE, distributed Rubicon Capital Advisors' marketing materials about the Project, breaching Plaintiff's agreement with Rubicon Capital Advisors.

7

- In October 2020, Plaintiff received documentation reflecting a letter of intent from British American Energy where LAE, which had no ownership interest in the Project, gave AVATAI authority to sell 100% of the shares of the Project Company. Neither LAE nor Rodriguez had authority to do so.

- Two weeks ago, Plaintiff learned that LAE signed two power purchase agreements (PPAs) with the Argentinean government's electric company CAMESA for: (1) the solar project P.S. Los Zorritos on December 13, 2018, and (2) the wind project P.E. General Acha on November 23, 2018, naming Plaintiff as the strategic investor, despite the fact that Plaintiff had sold his shares to LAE on November 22, 2018. The RFP and PPA documents require the strategic investor to be a shareholder of the project companies at the time of signature of the PPAs. LAE intentionally misrepresented Plaintiff's shareholder status to CAMESA and, without authority, used Plaintiff's name to be able to sign those PPAs. Plaintiff received notice of this fraud against him and against the Argentinian government by LAE two weeks ago and is exploring his legal options

## IV.    CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract (MOU)

28.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 26 above.

29.     The MOU is a valid and enforceable contract.

30.     At all relevant times, Plaintiff was in compliance with the terms of the MOU and performed all obligations thereunder.

31.     Defendants breached the MOU by failing to meet various milestones.

32.     As a result of Defendants' breaches, Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against Defendants, damages in an amount to be determined at trial, including attorneys' fees, and all other relief to which Plaintiff is entitled.

### COUNT II
### Breach of Contract (First Amended MOU)

33.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 31 above.

34.     The First Amended MOU is a valid and enforceable contract.

35. At all relevant times, Plaintiff was in compliance with the terms of the First Amended MOU and performed all obligations thereunder.

36. Defendants breached the First Amended MOU by, *inter alia*, failing to perform, increasing costs beyond estimates, and further delay.

37. As a result of Defendants' breaches, Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against Defendants, damages in an amount to be determined at trial including attorneys' fees, and all other relief to which Plaintiff is entitled.

## COUNT III
## Breach of Contract (Second Amended MOU)

38. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 36 above.

39. The Second Amended MOU is a valid and enforceable contract.

40. At all relevant times, Plaintiff was in compliance with the terms of the Second Amended MOU and performed all obligations thereunder.

41. Defendants breached the Second Amended MOU by, *inter alia*, failing to close by the deadline prescribed on a sale of the Project, and causing additional delays and increase in costs.

42. As a result of Defendants' breaches, Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against Defendants, damages in an amount to be determined at trial, including attorneys' fees, and all other relief to which Plaintiff is entitled.

## COUNT IV
## Declaratory Judgment

43. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 41 above.

44.     This cause of action is brought under section 37.001 of the Texas Civil Practice and Remedies Code, 28 U.S.C. 2201, and Fed. R. Civ. P 57, as there is an actual and justiciable controversy between the parties.

45.     The Development Agreement terminated on March 15, 2021 prior to the closing of the Greenalia deal.  Pursuant to the terms of the Development Agreement, Defendants were not entitled to any compensation under any legal theory.  Development Agreement, Sec. 2.5(D).

46.     As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the parties as to whether the Plaintiff owes any compensation to Defendants.

WHEREFORE, Plaintiff demands judgment against Defendant; declarations as follows:

(a)     that the Development Agreement is a valid, enforceable and unambiguous contract;

(b)     that the Development Agreement terminated on March 15, 2021;

(c)     that the Greenalia deal for the purchase of the Project closed after the Development Agreement terminated;

(d)     that Defendants are not entitled to any compensation from Plaintiff under the Development Agreement or otherwise;

and all other relief to which Plaintiff is entitled.

Dated:  November 12, 2021.

Respectfully Submitted,

**HOLLAND & KNIGHT LLP**

By: */s/ L. Bradley Hancock*
L. Bradley Hancock
State Bar No. 00798238
SD Bar No. 21091
Brad.hancock@hklaw.com
Annapoorni R. Sankaran
State Bar No. 24071918
SD Bar No. 1097856
Anna.Sankaran@hklaw.com

10

        811 Main a Street, Suite 2500
        Houston, Texas 77002-5227
        713-821-7000 - Telephone
        713-821-7001- Facsimile

**ATTORNEYS FOR PLAINTIFF MIGUEL ONETO, AS TRUSTEE OF THE MIGUEL ONETO TRUST**